**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**DARRELL LEA DEAL,**

> **Plaintiff,**

**v.**                                                                  **CASE NO. 2:14-cv-25071**

**CAROLYN W. COLVIN,
Commissioner of Social Security,**

> **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

Pending before this Court is Plaintiff's Brief in Support of Motion for Judgment on the Pleadings (ECF No. 10), Brief in Support of Judgment on the Pleadings (ECF Nol. 13) and Plaintiff's Reply to Defendant's Brief in Support of Decision (ECF No. 14).

Claimant's, Darrell Lea Deal, application summary for disability insurance benefits (DIB) under Title II and Part A of Title XVIII of the Social Security Act was completed on February 7, 2011 (Tr. at 177-180) and application for summary for supplemental security income (SSI) under Title XVI of the Social Security Act was completed on February 14, 2011 (ECF No. 181-189). In both applications, Claimant alleged disability beginning on October 1, 2010 (Tr. at 177, 181). The claims were denied initially (ECF No. at 86-96 and ECF No. at 97-107) and upon reconsideration (Tr. at 113-119 and ECF No. 120-126). Claimant filed a Request for Hearing by Administrative Law Judge on June 16, 2011 (Tr. at 127-129). In his request for a hearing before an Administrative Law Judge (ALJ), Claimant stated that he disagreed with the determination made on his claim for Supplemental Security Income/Social Security benefits because the Decision was contrary to the medical evidence and regulations. Claimant appeared in person and

testified at a hearing held in Charleston, West Virginia on February 7, 2013 (Tr. at 27-80).  In the Decision dated February 14, 2013, the ALJ determined that based on the application for a period of disability and disability benefits, the Claimant was not disabled under the Social Security Act. Further, the ALJ also determined that based on the application for supplemental security income, the Claimant was not disabled under the Social Security Act.  On April 12, 2013, Claimant filed a Request for Review of Hearing Decision because the ALJ's Decision was contrary to the medical evidence and regulations (Tr. at 8).  On April 17, 2014, the Appeals Council received additional evidence which was made part of the record (Tr. at 6).  This evidence was listed in AC Exhibits List as Exhibit 14E Representative Brief from Jan Dils, dated April 12, 2013.  On April 17, 2014, after considering Claimant's disagreement with the decision and the additional evidence made part of the record, the Appeals Council found no reason under its rules to review the ALJ's decision and therefore denied Claimant's request for review (Tr. at 1-7).

On June 13, 2014, Claimant bought the present action requesting this Court to review the decision of the defendant and that upon review, reverse, remand or modify that decision.

<u>Standard of Review</u>

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2014).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  *Id.* § 404.1520(a).  The first inquiry under the sequence is

whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. *Id.* § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(e). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. *Hall v. Harris,* 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2014). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant has not engaged in substantial gainful activity since the alleged onset date (Tr. at 35). The ALJ found that Claimant suffers from the severe impairments of degenerative joint disease and chronic bilateral shoulder pain; mild lumbar spine degenerative disc disease; neuropathy; coronary artery disease; chronic obstructive pulmonary disease; mild mental retardation/borderline intellectual functioning; major depressive disorder; anxiety disorder NOS, and nicotine dependence. (*Id.*) The ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1 (Tr.

at 37).  The ALJ then found that Claimant has a residual functional capacity (RFC) to perform light work, reduced by exertional and nonexertional limitations[1] (Tr. at 41).  The ALJ found that Claimant is unable to perform any past relevant work (Tr. at 47).  The ALJ concluded that Claimant could perform jobs such as basket filler, garment bagger and hand packer (Tr. at 48).  On this basis, benefits were denied (Tr. at 50).

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In *Blalock v. Richardson*, substantial evidence was defined as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the Courts must not abdicate their traditional functions; they cannot escape their duty to scrutinize

---

[1] Claimant can lift and carry twenty pounds occasionally and ten pounds frequently.  Claimant can sit for at least six hours out of an eight-hour workday.  Claimant can stand and walk for about six to eight hours out of an eight-hour workday.  Claimant can occasionally reach overhead with the bilateral upper extremities, and can, frequently, but not constantly, reach in all other directions.  Claimant must avoid concentrated exposure to vibration and temperature extremes.  He must avoid even moderate exposure to fumes, dusts, gases, odors, poor ventilation and workplace hazards such as moving machinery and unprotected heights.  He can understand, remember and carry out simple, repetitive and routine tasks that require little independent judgment or decision-making.  He must work in a setting without stringent speed or rate-based production requirements.  He must work in static work setting in which there is little change in terms of tools used, the processes employed or in the work setting, and in which change, when necessary, is introduced gradually.  He must be shown his job duties and requires extra oral instruction and training to learn the job duties (Tr. at 41).

4

the record as a whole to determine whether the conclusions reached are rational.  *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Defendant's Brief in Support of Defendant's Decision provides the following accurate background of the Claimant:

> In November 1975, when Plaintiff was age seven and in first grade, he underwent a evaluation performed by Harold Slaughter, Jr., M.A., a psychologist (Tr. 386).  On the Wechsler Intelligence Scale for Children-Revised (WISC-R), Plaintiff scored a verbal IQ of 64, a performance IQ of 54, and a full scale IQ of 55 (Tr. 386). On achievement testing, Plaintiff placed in the pre-kindergarten or kindergarten level (Tr. 386).  Mr. Slaughter recommended that Plaintiff be placed in special education classes and should be retained in first grade (Tr. 386).  Plaintiff spent three years in the first grade (Tr. 330).

> In March 1979, when Plaintiff was age ten and in second grade, he underwent an evaluation performed by Annette Zavareei, the school psychologist (Tr. 330-31).  He was cooperative and got along with his peers but had difficulty with retention and was not making progress (Tr. 330).  On the WISC-R, he obtained a verbal IQ score of 77, a performance IQ score of 72, and a full scale IQ score of 72, which fell within the low average range (Tr. 331).  In achievement testing, Plaintiff scored in the 1.4-1.9 grade level range (Tr. 331).  Ms. Zavareei recommended that Plaintiff be placed in educable mentally retarded (EMR) classes and undergo speech and language therapy (Tr. 331).

> In June 1979, Plaintiff's individualized education program (IEP) noted that he possessed good comprehension skills, maintained good teacher and peer relationships, exhibited the ability to respond to things he knew about, and his weaknesses included difficulty abstracting, speech and language problems, and reading

level (Tr. 387).    Plaintiff continued to participate in special education classes (Tr. 387).

In March 1982, when Plaintiff was age thirteen and in seventh grade, he was evaluated by Charles Paskewicz, Ph.D. (Tr. 332-36).   During the examination, he was quiet, but polite and smiled often (Tr. 332).  Plaintiff reported that he liked school, was doing well, was passing his classes, and was having no problems (Tr. 332).  Dr. Paskewicz noted that Plaintiff learned to be pleasant and uncontroversial as a way of getting along (Tr. 332).  On the WISC-R, Plaintiff obtained a verbal scale IQ of 67, which fell in the deficient range, and a performance scale IQ of 82, which fell in the low average range (Tr. 332-33).  His achievement test scores fell within the same range as his verbal IQ score (Tr. 335).  Compared to his scores from 1979, he showed a decline in verbal skills, but demonstrated significant increase in performance skills (Tr. 333). His lower scores suggested that his learning may be reduced by distractibility, but that he was an excellent candidate for vocational training (Tr. 333, 336).

According to his eighth grade IEP, Plaintiff's strength's included a pleasant and cooperative attitude, positive attitude towards school, and improvement on achievement tests in reading, writing, and arithmetic (Tr. 369).    His weaknesses included expressive language, math, reading, and spelling (Tr. 369).

In his tenth grade IEP in 1984, Plaintiff was noted as being pleasant and cooperative, having a positive attitude towards school, and showing improvement in arithmetic, but having deficits in all academic areas and expressive language (Tr. 337).  He was placed in regular education with resource services, including special education in reading, language arts, math, and science (Tr. 337).  In tenth grade, Plaintiff "quit" school to work (Tr. 548).

…

In June 2011, Larry J. Legg, M.A., a psychologist, conducted a consultative examination of Plaintiff (Tr. 547-53).  Plaintiff drove himself to the examination and had a valid driver's license (Tr. 547). He was married and lived with his wife, six-year-old child, and 14-year-old twin step-children (Tr. 547).  Plaintiff stated that he "quit" school after the ninth grade to work (Tr. 548).  He was in special

education classes and stated he could not read nor write (Tr. 548). Plaintiff stated that he did not exhibit any significant deficits in other adaptive behaviors during the developmental period (Tr. 548). Plaintiff stated that he worked as a welder in 2007 and 2008, but he worked as a mechanic and truck driver for most of his life (Tr. 548-49). His primary care physician prescribed him antidepressants for the last year, but that he received no other treatment for mood and anxiety symptoms (Tr. 548-49). He never received outpatient community mental health services and has never been psychiatrically hospitalized (Tr. 549).

On the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV), Plaintiff had a verbal comprehension index score of 72, a perceptual reasoning index score of 63, a working memory index score of 63, a processing speed index score of 59, and a full scale IQ of 59 (Tr. 550). Dr. Legg noted that he considered the scores slightly lower than expected given Plaintiff's self-reported education and vocational background (Tr. 550). Dr. Legg opined that a diagnosis of mental retardation based on Plaintiff's full scale IQ score, which placed him in the extremely low range of general intellectual functioning, was inappropriate given Plaintiff's self-reported history and lack of any significant deficits in his adaptive behaviors during the developmental period (Tr. 551). Plaintiff's achievement scores indicated markedly deficient functional academic skills (Tr. 551).

On examination, Plaintiff was fully oriented, cooperative, polite and appropriately dressed (Tr. 547, 551). His speech was slow but of normal tone and adequate production (Tr. 551). He had a dysphoric mood and flat affect (Tr. 551). He had normal thought process, normal thought content, normal perception, normal psychomotor behavior, fair insight, normal judgment, no suicidal or homicidal ideation, normal immediate memory, normal recent memory, mildly deficient remote memory, severely deficient concentration, normal persistence, and mildly deficient pace (Tr. 551). He had mildly deficient social functioning based on observation (Tr. 552). He reported getting along well with his wife and children and having one good friend (Tr. 551). He enjoyed taking care of his honey bees and hunting though he had not hunted in a year (Tr. 551). Plaintiff stated that he spent most of his day performing minimal types of household and outside chores and childcare responsibilities (Tr. 552).

7

Dr. Legg diagnosed Plaintiff with anxiety disorder, major depressive disorder, and borderline intellectual functioning (Tr. 552). Dr. Legg stated Plaintiff's prognosis was fair (Tr. 553). He also opined that Plaintiff was capable of managing his own finances (Tr. 553).

In September 2011, Dr. Legg prepared an addendum after reviewing Plaintiff's mental health and school records (Tr. 802). Dr. Legg indicated that the records showed IQ scores in the extremely low range of general intellectual functioning at age 7, and IQ scores in the borderline range at the ages of 11 and 13 (Tr. 802). Dr. Legg also noted that Plaintiff had a history of special education due to his IQ scores and markedly deficient achievement scores (Tr. 802). Dr. Legg also reviewed a work history report, completed in April 2011, that revealed that Plaintiff was competitively employed in a number of occupations (Tr. 802). Dr. Legg indicated that Plaintiff did not exhibit any significant deficits in his adaptive behaviors during the developmental period other than his functional academics (Tr. 803). Again, Dr. Legg diagnosed Plaintiff with borderline intellectual functioning and indicated that a diagnosis of mental retardation was inappropriate (Tr. 803).

…

In June 2011, J. Hill Keyes, Ph.D., conducted a review of Plaintiff's records, and assessed that he had the mental capacity to understand, remember, and carry out 1-2 step worklike procedures learned and performed routinely with few variables; maintain adequate concentration and attention with minimum limitation; to accept supervision required that is simple, direct, and concrete (unskilled), but may have minimum limitations adapting to mild limits in his language processing/comprehension skills (Tr. 572). In evaluating whether Plaintiff met or equaled any of the mental Listings, Dr. Keyes indicated that Plaintiff had a moderate restriction in activities of daily living, mild difficulties in social functioning, moderate difficulties maintaining concentration, persistence, and pace, and no episodes of decompensation (Tr. 566). Dr. Keyes noted that Plaintiff had a longstanding history of low intellectual functioning and that he likely had borderline intellectual functioning complicated by a language issue (Tr. 568). Dr. Keyes noted that this would account for "uneven functional presentation with low IQ scores" (Tr. 568). Dr. Keyes indicated that Plaintiff

adaptively functioned well with limitations related to low achievement and some limits in concentration (Tr. 568). Based on past vocational history, Plaintiff appeared cognitively capable of at least simple, repetitive tasks (Tr. 568). In September 2011, Holly Cloonan, Ph.D., affirmed Dr. Keyes' assessment (Tr. 804).

…

In December 2012, Timothy Sarr, Ph.D., a psychologist, evaluated Plaintiff to determine his ability to parent after his teenage step-daughter accused him of child sexual abuse (Tr. 896-905). On examination, Plaintiff was fully oriented, cooperative, and his social skills were acceptable (Tr. 901). He had normal psychomotor activity, a euthymic mood with a congruent affect, moderately impaired memory, moderately impaired attention and concentration, normal thought process, normal thought content, bad judgment and impulse control based on behavior allegation, poor sight, and no suicidal or homicidal ideation (Tr. 901).

On the Wechsler Abbreviated Scale of Intelligence, Second Edition (WASI-II), Plaintiff's scores indicated that he was currently functioning in the lower-extreme range in verbal comprehension with a score of 67, perceptual reasoning with a score of 66, and general intelligence with a full scale IQ score of 64 (Tr. 901). Plaintiff's scores indicated that his cognitive potential was in the lower-extreme range (Tr. 902). In the Wide Range Achievement Test – Fourth Edition (WRAT-IV), his achievement score were commensurate with his IQ and indicated that he is functioning in the lower-extreme range of cognitive potential and achievement (Tr. 902). On the Independent Living Scales (LLS), an assessment that measures one's current ability to care for themselves, Plaintiff's adaptive functioning was the minimum standard score for the areas of memory/orientation, managing money, managing home and transportation; the low range in health and safety; and moderate range in social adjustment (Tr. 903). His scores indicated he functioned socially at a moderate level, but struggled with managing activities of daily living (Tr. 903). He was diagnosed with mild mental retardation and assigned a global assessment of functioning (GAF) score of 65, which correlates with only mild symptoms or functional limitations (Tr. 903). Dr. Sarr indicated that Plaintiff's cognitive deficits significantly impact his decision-making, impulse

control, and other behavior parameters (Tr. 903).   Given his cognitive limitations and the prognosis for improvement, the level of acceptable parenting for Plaintiff was guarded (Tr. 904).  (ECF No. 20).

## The Medical Record

The court has reviewed all evidence of record, and will address those portions which are relevant to the issues raised by Claimant.

## Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the ALJ's finding that Listing 12.05C is not met is not supported by substantial evidence (ECF No. 14).  Claimant asserts that the ALJ erroneously found no deficits in adaptive functioning manifested during the developmental period and cited Claimant's work history as support for finding that he had no deficits in adaptive functioning.  Claimant argues that the ALJ ignored medical evidence of testing which demonstrates severe deficits in adaptive functioning.  In response, Defendant asserts that Claimant failed to meet all the criteria of Listing 12.05C because he lacks significant deficits in adaptive functioning prior to age twenty-two (ECF No. 20).

## Discussion

The five-step sequential evaluation process applies to the evaluation of both physical and mental impairments.  20 C.F.R. § 416.920a (a) (2014); 20 C.F.R. § 404.1520a (a) (2014). In addition, when evaluating the severity of mental impairments, the Social Security Administration implements a "special technique," outlined at 20 C.F.R. §§ 404.1520a and 416.920a.  *Id.*  First, symptoms, signs, and laboratory findings are evaluated to determine whether a claimant has a medically determinable mental impairment.  §§ 404.1520a(b)(1) and 416.920a(b)(1) (2014). Second, if the ALJ determines that an impairment(s) exists, the ALJ must specify in his/her decision the symptoms, signs, and laboratory findings that substantiate the presence of the

impairment(s).  §§ 404.1520a(b)(1) and (e), 416.920a(b)(1) and (e) (2014).  Third, the ALJ then

must rate the degree of functional limitation resulting from the impairment(s). §§ 404.1520a(b)(2)

and 416.920a(b)(2) (2014).   Functional limitation is rated with respect to four broad areas

(activities of daily living, social functioning, concentration, persistence or pace, and episodes of

decompensation). §§ 404.1520a(c)(3) and 416.920a(c)(3) (2014).  The first three areas are rated

on a five-point scale: None, mild, moderate, marked, and extreme.  The fourth area is rated on a

four-point scale:  None, one or two, three, four or more.  §§ 404.1520a(c)(4) and

416.920a(c)(4)(2014).  A rating of "none" or "mild" in the first three areas, and a rating of "none"

in the fourth area will generally lead to a conclusion that the mental impairment is not "severe,"

unless the evidence indicates otherwise. §§ 404.1520a(d)(1) and 416.920a(d)(1) (2014).  Fourth,

if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity

to a mental disorder listed in Appendix 1. §§ 404.1520a(d)(2) and 416.920a(d)(2) (2014).  Fifth,

if a mental impairment is "severe" but does not meet the criteria in the Listings, the ALJ will assess

the claimant's residual functional capacity.  §§ 404.1520a(d)(3) and 416.920a(d)(3) (2014).  The

ALJ incorporates the findings derived from the analysis in the ALJ's decision:

> The decision must show the significant history, including
> examination and laboratory findings, and the functional limitations
> that were considered in reaching a conclusion about the severity of
> the mental impairment(s). The decision must include a specific
> finding as to the degree of limitation in each of the functional areas
> described in paragraph (c) of this section.

§§ 404.1520a(e)(2) and 416.920a(e)(2) (2014).

As Claimant's civil action focuses on the assertion that the ALJ failed to determine that

Claimant satisfied the criteria for Listing 12.05C for Intellectual disability, this Court will address

the sole allegation (ECF Nos. 3, 15, 21).  Claimant avers the following:

The ALJ noted that the claimant's IQ scores satisfied the IQ criteria of both listing sections 12.05B and 12.05C. T. 40, citing Legg T. 547-555 and Saar, T.896-905. T. 40.Thus, the first prong of Listing 12.05C has been established.  The ALJ found physical and mental impairments which prevented performance of past work and limited the claimant to a restricted range of light work. T. 41, 47. These other impairments obviously imposed additional and significant work-related limitations of function.  Thus, the third prong of Listing 12.05C has been established. The remaining issue concerns the second prong of the listing, the requirement of lack of adaptive function in two areas prescribed by DSM-IV-TR initially manifested during the developmental period.  Functional academics was demonstrated currently and during the developmental period. T. 40.  Thus, only one additional deficit area of lack of adaptive function is required, currently and during the developmental period.

The ALJ stated:

"...the record does not include evidence of deficits of adaptive functioning - a requisite element to meet or equal the listing sections. 'Adaptive functioning' describes 'how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background and community setting' (DSM-IVR-42)." T. 40.

At the time of the decision the DSM-IV-TR criteria for mental retardation included concurrent deficits or impairments in present adaptive functioning in two of 10 areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. The Saar report and all psychological reports in the record identified extremely low scores in functional academic skills. Legg obtained reading and spelling scores at the kindergarten level, T. 551, while Saar obtained scores in the lowest .1 percentile. T. 902.  The Saar report of specific Adaptive Skills testing found the lowest possible scores in managing home and transportation, also low scores in health and safety. T. 902-903. The Saar report established lack of adaptive function in at least two additional areas of adaptive function equivalent to those described in DSM-IV-TR. The ALJ failed to mention the Saar Adaptive Skills Assessment or to assign any weight afforded the report and the reasons for such assignment. T. 40.  (ECF No. 15).

12

Listing 12.05

In order to meet Listing 12.05C, at the time of the decision, Claimant must show the following: (1) deficits in adaptive functioning that manifested before age twenty-two; (2) a valid verbal, performance, or full scale IQ of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C; *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012).

In dispute in the present matter is Claimant's deficits in adaptive functioning. The ALJ considered the evidence of Claimant's intellectual functioning under listing 12.05C. The ALJ found that the record does not include evidence of deficits of adaptive functioning – a requisite element to meet or equal the listing section (Tr. at 40). Deficits in adaptive functioning include limitations in areas such as communication, self-care, home living, social/ interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety. *Atkins v. Virginia,* 536 U.S. 304, 309 n. 3 (2002).

"Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *See Diagnostic and Statistical Manual of Mental Disorders (Text Revision)* 37 (4th ed. 2000) (DSM-IV-TR). Deficits can include limitations in self-care, home living, use of community resources, self-direction, functional academic skills, work, leisure, health and safety. *Atkins v. Virginia*, 536 U.S. 304, 309, n. 3 (2002); *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (holding that deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic

skills, work, leisure, health, and safety); *Burkhammer v. Comm'r of Soc. Sec.*, No. 12-113, 2013 WL 4478105, *6 (N.D.W.Va. Aug. 19, 2013).

Claimant's education records include: (i) Wechsler Intelligence Scale for Children-Revised (WISC-R) valid IQ test results from 1979 at age ten, reflecting a verbal IQ score of 77, a performance IQ score of 72, with a full scale IQ score of 72; and (ii) WISC-R valid IQ test results from 1982 to age thirteen, indicating a verbal IQ score of 67 and a performance IQ score of 82, that were administered by school psychologists. In addition, the record includes Wechsler Adult Intelligence Scale, Fourth Edition (W AIS-IV) valid IQ testing results, dated June 6, 2011, indicating the claimant has a verbal IQ of 72 and a full scale IQ of 59, administered in connection with the consultative mental evaluation performed by Mr. Legg on June 6, 2011. The record also includes Wechsler Abbreviated Scale of Intelligence, 2nd Edition (W AISI-II) IQ testing results indicating a verbal IQ of 67 and a full scale IQ of 64, administered by Dr. Saar, during a psychological evaluation performed on December 20, 2012.

Defendant asserts the following:

> Claimant's low IQ score do not establish that he had a deficit in adaptive functioning. Merely documenting IQ scores prior to age twenty-two does not satisfy a claimant's burden to prove deficits in adaptive functioning prior to age twenty-two, because this would render redundant the capsule definition and the specific IQ requirement of paragraph C. *See Witt v. Barnhart*, 446 F. Supp. 2d 886, 896 (N.D. Ill. 2006) (finding that an IQ score of 67 did not establish deficits in adaptive functioning because "[t]his is an impermissible outcome and the Court will not give [the claimant's] IQ score more weight than it deserves. . . . The Court will not collapse Listing 12.05C's three-part test into two parts."); *Justice v. Barnhart*, 431 F. Supp. 2d 617, 619 (W.D. Va. 2006) (the "Fourth Circuit has not held that low IQ alone proves manifestation of deficits in adaptive functioning before age 22."). Accordingly, there is no "necessary connection" between an individual's IQ score and his relative adaptive functioning. *Talavera v. Astrue*, 697 F.3d 145,

153 (2nd Cir. 2012).  Moreover, the regulations make clear that IQ scores are "only part" of the overall assessment, and that the narrative report of the examining psychologist is critical for examining developmental history and the degree of functional limitation.  20 C.F.R. Partpt. 404, subpt. P, app. 1, § 12.00(D)(6)(a). (ECF No. 20).

Claimant's reliance upon academic records, failure to graduate high school and history of special education classes is insufficient to demonstrate that he had deficits in adaptive functioning prior to age twenty-two.  See, e.g. *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 540 (6th Cir. Jan. 21, 2014) (finding that Peterson had not demonstrated the requisite deficits in adaptive functioning although he could only read at a fifth grade level, perform eight grade math and dropped out of school); *Eddy v. Comm'r of Soc. Sec.*, 506 F. App'x 508, 510 (6th Cir. 2012) (holding that a claimant's eight grade education with a history of special education classes did not demonstrate deficits in adaptive functioning prior to age twenty-two); *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 676-677 (6th Cir. 2009) ("This Court has never held that poor academic performance, in and of itself, is sufficient to warrant a finding of onset of sub-average intellectual functioning before age twenty-two."); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (finding that a ninth grade education completed through special education classes, followed by numerous unsuccessful attempts at a GED, coupled with an adult full-scale IQ of 69 did not establish deficits in adaptive functioning).

The ALJ refers to Mr. Legg's consultative mental evaluation finding that "a diagnosis of mental retardation would be inappropriate for the claimant given his self-reported history and a lack of deficits in his adaptive behaviors during his developmental period" (Tr. at 40).  Mr. Legg diagnosed Claimant with borderline intellectual functioning.  Mr. Legg stated that Claimant showed adaptive behaviors during the developmental period other than his functional academics,

noting that Claimant's work history report, completed by Claimant on April 22, 2011, indicates he has been competitively employed in a number of occupations.  The ALJ agreed with Mr. Legg and held that although the record indicates Claimant was in special education classes and he quit school before completing high school, the record also indicates Claimant had an extensive vocational background, working as a welder, truck driver and mechanic.

The ALJ found that Claimant's vocational history demonstrates that he was adaptive and coped well with life demands.  His adaptive skills were demonstrated by his self-reported activities of daily living, including driving, hunting, fishing, running errands, shopping, taking care of honeybees, using a cell phone and his involvement with family and friends.

Claimant argues that the ALJ failed to consider the evaluation performed by Dr. Sarr to determine Plaintiff's ability to parent after his teenage step daughter accused him of sexual abuse. Claimant asserts that Dr. Sarr's evaluation establishes deficits in adaptive functioning prior to age twenty-two.  However, Claimant is mistaken because the ALJ did consider and discuss the results of Dr. Sarr's evaluation (Tr. at 39-40).  Additionally, Dr. Sarr's evaluation was performed to determine Claimant's ability to parent his teenage step daughter after he was accused of sexual abuse, therefore, the evaluation assessed Claimant's current[2] adaptive functioning.  The ALJ concluded that Claimant's extensive work history and self-reported activities of daily living exceed limitations that Claimant alleges.

Lastly, Listing section 12.05C requires that the medical evidence must establish significantly subaverage general intellectual functioning with deficits in adaptive functioning established by 1) a valid verbal, performance, or full-scale IQ score of 60 through 70 and 2) a physical or other mental impairment imposing an additional and significant work-related limitation

---

[2] Dr. Sarr's psychological evaluation was performed on December 20, 2012.

16

of function.  As discussed above, the ALJ did not find that Claimant's IQ score established a deficit in adaptive functioning.  Nor did the ALJ conclude that Claimant established deficits in adaptive functioning from his alleged mental impairments "imposing an additional and significant work-related limitation of function."

At the hearing, a vocational expert testified that Claimant has past relevant work as a welder helper at the heavy exertional level unskilled, as an off road truck driver at the medium exertional level unskilled, as a mechanic helper at the medium exertional level unskilled and as a machine maintenance helper at the medium exertional level.  The ALJ concluded that Claimant is unable to perform his past relevant work and is now limited to work at the light exertional level (Tr. at 47). The vocational expert testified that given Claimant's age, education, work experience and residual functional capacity, representative occupations such as basket filler, garment bagger and a hand packer, could be performed (Tr. at 48).  Claimant's counsel asked the vocational expert to consider additional limitations, however, the ALJ did not find that these limitations were supported by evidence.  Based on the testimony of the vocational expert, the ALJ concluded that, considering Claimant's age, education, work experience and residual functional capacity, Claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy (Tr. at 48-49). Therefore, Claimant failed to meet the requirements for listing level severity under 12.05C.

The ultimate decision about disability rests with the Commissioner.  20 C.F.R. §§ 416.927(e)(1) and 404.1527(e)(1) (2014).  Accordingly, the court recommends the District Judge find that the ALJ's decision is supported by substantial evidence.

<u>Conclusion</u>

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner, **DENY** Plaintiff's Brief in Support of Judgment on the Pleadings and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED and a copy will be submitted to the Honorable Judge John T. Copenhaver, Jr.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B) and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Date:   September 1, 2015

Dwane L. Tinsley
United States Magistrate Judge